Joe David WILLIAMS *v.* ARKANSAS OIL & GAS
COMMISSION, et al.

91-51                                      817 S.W.2d 863

Supreme Court of Arkansas
Opinion delivered October 28,1991

*Don Gillaspie*, for appellant.

*Crumpler, O'Connor & Wynne*, for appellee.

*Keith, Clegg & Eckert*, for intervenor-appellee Oryx Energy
Co.

DAVID NEWBERN, Justice. The appellant, Joe David Wil-
liams, and others represented by him (Williams group) own
working interest mineral leases in two 20-acre tracts in Miller
County. These tracts are part of the Rodessa Field which
encompasses the oil producing Gloyd Formation. The Williams

group established two wells on these tracts, Freedom A-1 and Freedom Prospect. When this case arose, Freedom Prospect was not producing oil from the Gloyd Formation but Freedom A-1 was. Sun Exploration and Development Company, now Oryx Energy Company, filed a petition before the appellee, Arkansas Oil and Gas Commission (AOGC), for the establishment of a secondary recovery water flood unit for the Gloyd Formation. This proposed unit included the leases of the Williams group. The Williams group refused to convert their leases voluntarily and opposed the compulsory unitization formulated at a series of hearings before the AOGC culminating on May 24, 1988.

Williams appeared before the AOGC with counsel to object to the proposed unit, asserting that the formula developed by Oryx was unfair. Williams presented no expert testimony. During the hearing he cross-examined Oryx's witnesses concerning the basis of the formula by which they proposed to distribute proceeds and charge expenses. Each witness insisted the formula was commonly used in the industry and that the computations were not unfair. The unitization petition was granted by a unanimous vote of the eight participating commissioners.

Williams filed a petition for injunctive relief in the Chancery Court on May 26, 1988, challenging the unitization order. A hearing was set, and discovery began. Oryx took a deposition of Williams's potential expert witness, Henry Coutret, in which he said the basic formula for distribution of unit costs and income was fair but one aspect could be in violation of the law, depending on how it was interpreted. As Williams's counsel interpreted it, it would be wrong. If interpreted in accordance with Oryx's responses to interrogatories, it could be proper. By agreement of the parties, the unitization was held in abeyance pending the outcome of the trial. On the first date set for trial, January 25, 1990, Henry Coutret was present to testify on Williams's behalf. On the day of trial, Oryx filed a motion to transfer the case to the Circuit Court, objecting to chancery jurisdiction and to the receipt of any additional evidence. The hearing was cancelled. The Chancellor later rejected the jurisdictional challenge by letter ruling on May 3, 1990. He withheld ruling on the question of the scope of his review and asked that the parties provide briefs on the issue.

One week before the subsequently scheduled hearing, the Chancellor informed the parties he would receive evidence on the issue raised before the Commission, *i.e.*, whether the formula was fair. Counsel for Williams, Don Gillaspie, had made it known to counsel for the Commission, William Wynne, that he would introduce additional testimony from Coutret. Coutret could not be present for the rescheduled hearing. Gillaspie told Wynne that if Wynne and Oryx's counsel would set up a time to take Coutret's deposition to be admitted in evidence, Gillaspie would participate at their convenience.

At some point Wynne agreed to participate in the taking of the deposition. Apparently Oryx's counsel, Oliver Clegg, agreed to pay for the deposition. After consideration of the chancellor's ruling concerning receipt of evidence, Wynne apparently decided the deposition was unnecessary under any circumstances. He did not convey this decision to Gillaspie. Wynne informed Coutret he would notify him on the Friday before the hearing but did not do so. At the scheduled June 7 hearing Gillaspie began by requesting that the Chancellor hold the record open for receipt of a deposition from Coutret. Counsel for the Commission and Oryx objected to the receipt of any evidence after the date of the hearing. The Chancellor ruled he would accept no additional evidence unless all parties agreed to it. Gillaspie renewed his request for the Chancellor to hold the record open. The request was denied. After review of the evidence, including the hearing before the Commission, the analysis from Coutret, and the discovery, the Chancellor found the Commission order to be fair and in conformity with the statutory scheme.

Williams has raised three points of appeal. First, he contends the Chancellor abused his discretion in refusing to receive additional evidence. Second, the order approved by the Commission fails to comply with the mandatory provisions of the unitization statute. Third, under the circumstances of this case, the unitization act permits a taking of private property without just compensation in violation of the Arkansas Constitution. The decree is reversed and remanded, as we find the first point to be meritorious, and the second one may have merit as well.

## 1. Receipt of evidence

Williams argues that, because counsel for the Commission and Oryx repudiated their agreement to permit the taking of the additional evidence in the form of a deposition of Coutret, the Chancellor erred by refusing to hold the record open. The issue was characterized by the Trial Court and argued here by the parties as whether the Court erred in denial of a continuance.

■ The rule is very clear that the granting or denial of a continuance is a matter within the sound discretion of the Trial Court, and such a ruling will not be disturbed unless the Court has abused that discretion. *Smith* v. *City of Little Rock*, 279 Ark. 4, 648 S.W.2d 454 (1983); *Bolden* v. *Carter*, 269 Ark. 391, 602 S.W.2d 640 (1980).

The Chancellor's authority and scope of review in this matter are established by Ark. Code Ann. § 15-72-106(a) and (c) (1987) as follows:

Court review by aggrieved person — Injunction.

(a)    Any interested person adversly affected by any statute of this state with respect to conservation of oil or gas, or both; by any provisions of this act; by any rule, regulation, or order made by the commission thereunder; or by any act done or threatened thereunder, and who has exhausted his administrative remedy, may obtain court review and seek relief by a suit for injunction against the commission as defendant or against the members of the commission by suit in the chancery court of the county in which the property involved is located.

(c)    In the trial, the burden of proof shall be upon the plaintiff, and *all pertinent evidence with respect to the validity and reasonableness of the order of the commission complained of shall be admissible.* [Emphasis supplied]

Clearly the Chancellor is authorized to receive all pertinent evidence concerning the "validity and reasonableness" of the Commission's order. Williams had the burden of presenting that evidence. In the lengthy discussion which took place in response to the motion to hold the record open on June 7 the Chancellor

stated:

Gentlemen, when I wrote this letter on May 3rd, and Mr. Gillaspie, granting you the opportunity to proceed today and, of course, advising all of you that I wanted you to brief the issue which I felt was in question at the top of page two of my letter of May 3, the question in my mind was whether we reopened this thing for all evidence just as if we were hearing it for the first time, and, of course, as a trial de novo, or whether there was a limited scope of my review. I advised all three of you last week that I felt that the scope of my review was limited in regard to Arkansas Code 15-72-106C to a determination of whether the Arkansas Oil and Gas Commission had acted unreasonably in entering their Order of March 22, 1988. All of you understood that. No question in my mind but that I talked to each one of you and advised you of that. Gentlemen, this case has been set for today since shortly after May 3rd of 1990 for the purpose of introducing any further evidence that might be available to you. I advised you last week what I thought that evidence would or should consist of and what I would limit that evidence to. I think there has been ample opportunity on everybody's behalf to have everybody ready to appear here today, and today, gentlemen, is the day that I'm going to receive evidence. And I'm not going to receive any additional evidence after today unless it's by agreement of the parties. . . .

Gentlemen, again, this case was set for today shortly after within three or four days, certainly a week of May 3rd of 1990. When I advised you, gentlemen last week, I talked to you gentlemen last week on the telephone. I advised you that I did not expect additional testimony touching on other matters other than the reasonableness of the Order of the Arkansas Oil and Gas Commission. Today has been the day set for this hearing, today is the day that this hearing is going to be. Mr. Gillaspie, if you feel that because of the circumstances that have arisen that you are compelled to file a motion for continuance, and I am taking your statement as a motion for continuance, and I am denying your oral motion for continuance, and keeping with the recent decisions of the Arkansas Supreme Court, I

think you should file a written motion for continuance, I am denying that motion for continuance. . . . I understand completely what has taken place in this case, that does not get around the fact that this case has been set for at least a month.

The chancellor apparently failed to consider the fact that Wynne either did not fully appreciate the Court's ruling with respect to scope or did not agree with the ruling and that Wynne subsequently made a unilateral decision concerning the need for additional testimony from Coutret. During the hearing Wynne confirmed Gillaspie's assertions that he had agreed to arrange to obtain the deposition following the May 3rd letter and his subsequent change of heart as follows:

MR. WYNNE:

Now, as I understood the Court in his conversation with me and admittedly there has been some variations within the understanding of the three attorneys, but at least Mr. Clegg and I are in harmony that it was your position that you were willing not to foreclose, Mr. Gillaspie clarifying the record to the extent that it failed to include matters insofar as what was before the Commission at the time of the entry of the Order, but that you did not intend to open this record for the reception of testimony and evidence as it related to facts or circumstances subsequent to the date of the Order of the Commission which was entered effective May 24, 1988. . . .

I have never considered it my responsibility to engage Mr. Coutret or inquire as to his schedule when he is the expert for the Plaintiff and not the Defendant. In addition, Judge, the dialogue and conversation between Mr. Gillaspie and I concerning the evidential deposition of Mr. Coutret were all predicated upon the ruling which this Court made as to whether or not it would hear this matter de novo. If the matter was to be heard de novo, I certainly did tell Mr. Gillaspie of my willingness to arrange to schedule the evidentiary deposition of Mr. Coutret with the idea he would take the deposition since he would be sponsoring that witness's testimony. But, the Court in its ruling has determined the question of constitutionality is not at issue.

The matter is only one of reasonableness, and the pivotal points that are dispositive of the reasonableness of the Order if we limit the review to the record before the Court, that is the record that the Commission had that led to the adoption of the Order, then Mr. Coutret's testimony touches upon the points that are critical to the issue to be determined. Now, what Mr. Gillaspie is in actuality concerned about, Judge, is he wishes to include within this record not evidence that was not available at the time of the hearing before the Commission, he wishes to introduce into this record through the evidential deposition of Mr. Coutret testimony concerning facts and circumstances as they have occurred from and after the issuance of Order reference 37-88.

Clearly Wynne considered the Chancellor's ruling to mean that only evidence developed before the Commission or directly relating to that evidence was relevant, and he did not feel additional testimony from Coutret would be admissible by that standard.

The Chancellor was correct in ruling that the Statute would permit consideration of evidence developed subsequent to the Commission's order which was pertinent to the issues raised. The testimony of Coutret as proffered by Williams would undoubtedly be relevant to that issue. In his written motion Williams proffered Coutret's testimony, in relevant part, as follows:

14. If permitted to testify, Mr. Coutret would review the Unit Agreement, the Unit Operating Agreement, the data selected to be plugged in the basically fair formulae used therein, and would state that, under the evidence and factual background, the Order of the Commission is invalid and unreasonable.

Mr. Coutret would testify that the selection by intervenor of the period immediately following the production of the A. Capps well as the determining period to be used in calculations of the Phase I allocation among tracts was arbitrary and unreasonable and unfair to plaintiff's working interest owners. He would state that the data used resulted in a smaller allocation to Tract 33 was, at the date of the Order, producing some 30%, rather than 12%, of all

oil produced in the Unit Area.

Mr. Coutret would testify that under the circumstances of this case the provision of Article 11 of the Unit Agreement that all unit expense shall be allocated on the basis of the unit participation factor in effect at the time such unit expense is charged is in direct and express violation of the statute which requires that unit expenses shall be apportioned on the same basis as production.

He would testify that the Order will require Tract 33 to pay some 14 times more in operating expenses than its Phase II allocation of production so long as oil is being allocated to Phase I production. He would testify that even if Article 11 were amended to provide for apportionment of operating expenses at Phase II rates on a per/barrel basis Plaintiff's working interest owners would be required to pay many times more in operating expenses than their fair share due to the operation of injection wells and additional producers for which they would be charged a percentage of costs and which would in no way benefit them as to Phase I production due to the monthly limit.

The Chancellor's ruling on admissibility of additional evidence bearing on the reasonableness of the AOGC order was correct. Wynne's interpretation of the order as permitting only evidence taken before the AOGC was incorrect. The problem arises with the Chancellor's willingness to accept further evidence only by agreement of the parties. If that be regarded as an exercise of the Chancellor's discretion not to grant a continuance, we conclude it was an abuse of that discretion. On the record before the Chancellor it was clear that Wynne agreed with Gillaspie to schedule a further deposition with Coutret to be received in evidence, and his subsequent refusal to do so was a result of his misconstruction of the Statute and the Chancellor's order concerning the evidence which could be received. It was unfair to make continuance or receipt of evidence dependent on agreement of the parties. It was apparent such agreement would not be forthcoming for a reason which, at best, resulted from a misinterpretation of law.

## 2. Compliance with the statute·

Despite the error we find in point 1, we could affirm if we could conclude that the AOGC's decision was fair and reasonable and that that conclusion would obtain regardless of the prospect of Coutret's testimony. We cannot reach that conclusion.

Before discussing this point, a review of parts of the unitization formula is required. In testimony before the Commission it had been established that only 20% of the oil reserves in the proposed unit could be recovered by primary methods. Expert testimony from Oryx showed the field's primary reserve would be depleted in 1996, but secondary recovery unit operations would extend its productive life to 2006. The uncontradicted evidence showed that 288,000 barrels of oil represented the full recovery possible in primary reserves. Secondary reserves were set at 1.44 million barrels. All parties concurred that unitization of the field would be necessary and proper to prevent waste. The problem arose from the formula proposed to apportion the anticipated $6.1 million in expenses associated with unitization of the field. Oryx proposed a two-phase process designed to compensate all the parties having working interests, including the Williams group, for the remaining primary reserve in the first phase while charging each interest for its share of the expenses of developing the unitized field. In the second phase profit and expenses would be distributed and charged based on the participation of each working interest owner.

The key component of the proposal to which Williams takes exception is the allocation of expenses. Phase 1 of the unit would continue until all the primary reserves (288,000 barrels) had been recovered. The unit agreement contemplated the recovery of 3210 barrels of oil per month in primary reserves. The proceeds from these barrels would be assigned to each working interest owner based on Phase I tract participation. Any proceeds from recovery of oil above 3210 barrels would be assigned based on Phase II tract participation. Unit expenses were to be charged as follows:

> 11.1 *Basis of Charge to Lessees.* Unit Operator initially shall pay all Unit Expenses. Each Working Interest Owner shall reimburse Unit Operator for its share of Unit Expense. Each Working Interest Owner's share of such

Unit Expense shall be the same as its Phase II Unit Participation for the following items (a)-(d):

(a) items in the nature of capital assets including, without limitation, real property if acquired;

(b) acquiring, drilling, redrilling, equipping and re-equipping water injection wells, pumping and pipeline facilities for such wells, and changing any injection interval in any such well;

(c) gathering lines and facilities and common tank batteries utilized or acquired for Unit Operations; and

(d) water purchased or otherwise obtained for injection purposes and the costs of injection thereof into the Unit Area.

All other Unit Expense shall be allocated upon the basis of the Unit Participation in effect at the time such Unit expense is charged to the Joint Account.

The final paragraph allocating expenses forms the basis of Williams's statutory challenge to the formula.

In the initial analysis from Mr. Coutret's deposition based on the data provided by Oryx from which they developed the formula, he concluded that the basic unitization formula was fair and equitable for the circumstances but that the proposed method of allocation of expenses was somewhat ambigious and potentially represented a gross inequity. Upon receipt of further information in the form of Oryx's answers to Williams's interrogatories Coutret stated the following in a letter to Gillaspie:

\* \* \*

I can see why you are not clear as to exactly how they intend to allocate operating expenses between Phase I and Phase II when monthly production exceeds 3210 barrels. In reading the answer it sounds like they intend to apportion the operating charges to Phase I and Phase II participation relative to the monthly volumes of Phase I and Phase II production. Basically, my guess is (and it's only a guess) they will use the following formula to allocate monthly operating expenses when production exceeds

3210 barrels in any month before total Phase I cumulative production (from January 1, 1987) is 288,000 barrels.

$$\text{Charges} = \frac{(\text{Mo. Op. Cost}) \times (3210) \times (\text{Phase I factor})}{\text{Total Monthly Production}}$$

$$\frac{(\text{Mo. Op. Cost}) \times (\text{Total Monthly Prod.} - 3210) \times (\text{Phase II factor})}{\text{Total Monthly Production}}$$

This would mean that operating expenses would be allocated to working interest owners relative to their production during each Phase which is in conformance with the Arkansas statute.

* * *

It is apparent from Coutret's analysis that the unit agreement and the order of the Commission embodying that agreement contain an ambiguity which would permit the unit operators to charge certain Phase II expenses which are incurred during Phase I at the Phase I tract participation rate while only assigning Phase II proceeds to the Williams group accounts. Mr. Coutret could only "guess" the formula to be used. Arkansas Code Ann. § 15-72-310 (1987) provides:

Order requiring unit operation — Contents.
The order requiring unit operation shall be fair and reasonable under all circumstances and shall include:

* * *

(2) An allocation, upon the basis agreed upon by the provisions of the unit operating agreement, to each separately owned tract, which for all purposes of this section and §§ 15-72-308, 15-72-309, and 15-72-311 — 15-72-322, may be a previously established drilling unit if the unit operating agreement so provided, in the unit area, its fair share of all of the oil and gas produced from the unit area and not required or consumed in the conduct of the operation of the unit area or unavoidably lost. No allocation formula shall be adopted by the commission and put into effect unless it is based on the relative contribution to the unit operation, other than physical equipment, made by each separately owned tract or previously established drilling unit;

110

* * *

(4) A provision that a part of the expenses of unit operation, including capital investments, be charged to each separately owned tract in the same proportion that the tract shares in the unit production. The expenses chargeable to a tract shall be paid by the person or persons who, in the absence of unit operation, would be responsible for the expense of developing and operating the tract;

. . . .

While production being allocated based on the contribution to unit operation in Phase II is not at issue, the potential allocation of expenses at a Phase I tract participation level for Phase II expenses when such expenses are incurred during Phase I seems clearly to violate the statute. That this may occur was established by testimony before the Commission. During the hearing on May 24, 1988, Darlynne Hayden, unitization manager for Oryx, testified:

Q. [Mr. Gillaspie]: We would be paying point one two one three (.1213) percent of the operating expenses for each barrel, whether it was above or below the three thousand two hundred ten barrels (3,210) per month that's limited to Phase One, correct?

A.: Yes.

Q.: But we would be receiving as to the barrels over three thousand two hundred and ten only point zero zero eight eight (.0088), is that correct?

A.: For just that one tract.

Q.: That's correct, is it not?

A.: Yes.

Q.: So we'd be paying at a rate, what, ten times what we'd be receiving for Phase Two oil?

A.: Yes. But also your investments in developing the unit are carried under Phase Two, which is a very, very low rate. So you'd be reaping the benefits of a lot of new wells out there at the point zero eight eight for your investment.

Q.: We'd be paying also, would we not, at the same rate in Phase Two for those units that you say are being donated to us by Sun? That point zero zero eight eight is the only way we can reap benefits in Phase Two and we pay on that basis, do we not.

A.: You pay, yes, that's right.

* * *

Q.: Would you accept that it's at least six-and-a-half years that we would be paying twelve point one three percent (12.13) of all the operating expenses for the entire year?

A.: Yes.

■ The formula, if interpreted to require the Williams group to pay expenses at a higher percentage rate than their percentage share in production, would violate the statute, and evidence on that question should have been received.

### 3. Taking of property

■ Williams contends that under the circumstances of this case the order of unitization amounts to a taking of private property without just compensation. The contention is easily answered. The unitization order and the statutory scheme provide that the interests of the working interest owners will be transferred to the unit producer for the use and benefit of the working interest owner. Article 10 (f) of the agreement so provides. Article 10 of the agreement later provides that on abandonment of unit operations the agreement terminates and the interests revert to the contracts in place affecting the separate tracts. The compensation for the transfer is a share of the proceeds from the field which would not be available without secondary recovery. There has been compensation and there is no merit in this argument.

Reversed and remanded.

BROWN, J., not participating.